**Nos. 23-15499 and 23-15521 (Consolidated)**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Yurok Tribe, et al.,
*Plaintiffs/Joined Cross-Claimants/Appellees,*

v.

Klamath Water Users Association, et al.,
*Crossclaim-Defendant/Counter-Claimant/Appellant.*

On Appeal from the United States District
Court for the Northern District of California
No. 3:19-cv-04405-WHO

## BRIEF OF AMICI CURIAE OREGON WATER RESOURCES CONGRESS, NATIONAL WATER RESOURCES ASSOCIATION, OREGON FARM BUREAU FEDERATION, FAMILY FARM ALLIANCE, AGRIBUSINESS AND WATER COUNCIL OF ARIZONA, IDAHO WATER USERS ASSOCIATION, AND WASHINGTON STATE WATER RESOURCES ASSOCIATION IN SUPPORT OF APPELLANT KLAMATH WATER USERS ASSOCIATION AND REVERSAL

DAVID E. FILIPPI (Oregon Bar No. 965095)
MERISSA A. MOELLER (Oregon Bar No. 153926)
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
Telephone: 503.224.3380

WADE C. FOSTER (Idaho Bar No. 11105)
Stoel Rives LLP
101 S. Capitol Blvd., Suite 1900
Boise, ID 83702
Telephone: 208.387.9000

*Attorneys for Oregon Water Resources Congress, National Water Resources Association, and Oregon Farm Bureau Federation*

[Additional Amici and Counsel Listed in Signature Block]

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Fed. R. App. P. 29(c)(1) Amici Curiae provide the following corporate information:

Amicus Oregon Water Resources Congress ("OWRC") is a nonprofit trade association that represents irrigation districts, water control districts, drainage districts, water improvement districts, and other agricultural water providers across the State of Oregon. OWRC has no parent corporation and no corporate stockholders.

Amicus National Water Resources Association ("NWRA") is a nonprofit, voluntary organization of state water associations, whose members include cities, towns, water conservation and conservancy districts, irrigation and reservoir companies, ditch companies, farmers, ranchers, and others with interests in water issues in 14 Western states. NWRA has no parent corporation and no corporate stockholders.

Amicus Oregon Farm Bureau Federation ("OFBF") is a nonprofit grassroots organization representing the interests of Oregon's farming and ranching families and businesses. OFBF has no parent corporation and no corporate stockholders.

Amicus Family Farm Alliance (the "Alliance") is a nonprofit organization composed of family farmers, ranchers, irrigation districts, and allied industries in

16 Western states. The Alliance has no parent corporation and no corporate stockholders.

Amicus Agribusiness and Water Council of Arizona ("ABWC") is a nonprofit association that represents agribusinesses, irrigation districts, and drainage districts across the State of Arizona. ABWC has no parent corporation and no corporate stockholders.

Amicus Idaho Water Users Association ("IWUA") is a nonprofit corporation representing approximately 300 canal companies, irrigation districts, ground water districts, municipal and public water suppliers, hydroelectric companies, aquaculture interests, agribusinesses, professional firms, and individuals throughout Idaho. IWUA has no parent corporation and no corporate stockholders.

Amicus Washington State Water Resources Association ("WSWRA") is an association of agricultural water providers delivering water to farms throughout Washington State. WSWRA has no parent corporation and no corporate stockholders.

**FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(2) COMPLIANCE**

Pursuant to Fed. R. App. P. 29(a)(2), all parties provided written consent to filing of this brief.

**FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(4)(E) COMPLIANCE**

Pursuant to Fed. R. App. P. 29(a)(4)(E), no party or party's counsel authored the proposed brief in whole or in part, and no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief. No person other than Amici or their counsel has made a monetary contribution to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

FEDERAL RULE OF APPELLATE PROCEDURE 29(**a**)(2)
COMPLIANCE ........................................................................ ii

FEDERAL RULE OF APPELLATE PROCEDURE 29(**a**)(4)(E)
COMPLIANCE ........................................................................ iii

TABLE OF AUTHORITIES..............................................................vi

I.   INTRODUCTION .........................................................................1

II.  INTERESTS OF AMICI CURIAE .......................................................3

III. ARGUMENT................................................................................6

   A.   *Home Builders* sets forth the legal framework to resolve
        apparent conflicts between Section 7(a)(2) of the ESA and the
        Bureau's federal statutory mandates and contractual obligations........6

   B.   The Bureau must comply with its statutory mandates and
        contractual commitments to water users, and Section 7(a)(2) of
        the ESA cannot be interpreted to override these other federal
        obligations. .........................................................................10

   C.   The district court failed to seriously engage with the Bureau's
        statutory mandates and contractual obligations, based on a
        cursory conclusion that Congress generally granted the Bureau
        broad policy authority.........................................................12

   D.   Section 8 of the Reclamation Act mandates that the Bureau
        abide by and adhere to state water rights and comply with state
        water law.........................................................................13

        1.   Neither Section 6 nor Section 10 of the Reclamation Act
             functions to unravel the Bureau's congressional mandate
             to abide by and adhere to state water rights and follow
             state water law. .........................................................16

# TABLE OF CONTENTS
(continued)

**Page**

**2.** The ESA itself does not undermine the Bureau's congressional mandate to abide by and adhere to state water rights and follow state water law. ...................................19

**3.** Giving proper effect to the Bureau's mandate under Section 8 of the Reclamation Act protects the stability of Western water law. ..................................................................22

**E.** The Bureau must also honor existing, binding contracts, upon which water managers and human communities across the West rely. ............................................................................24

**IV.** CONCLUSION.................................................................29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. California,*
 460 U.S. 605 (1983)..................................................23

*Baley v. United States,*
 134 Fed. Cl. 619 (2017), *aff'd*, 942 F.3d 1312 (Fed. Cir. 2019) .......................28

*Cal. Or. Power Co. v. Beaver Portland Cement Co.,*
 295 U.S. 142 (1935)..................................................22

*California v. United States,*
 438 U.S. 645 (1978)..............................................passim

*City of Fresno v. United States,*
 160 Fed. Cl. 215 (2022) ............................................28

*Clear Creek Cmty. Servs. Dist. v. United States,*
 132 Fed. Cl. 223 (2017) ............................................28

*Confederated Tribes & Bands of Yakama Nation v. McDonald,*
 No. CY-02-3079-AAM, 2003 WL 1955763 (E.D. Wash. Jan. 24, 2003)..........15

*Defs. of Wildlife v. Norton,*
 257 F. Supp. 2d 53 (D.D.C. 2003)..................................20

*Env't Prot. Info. Ctr. v. Simpson Timber Co.,*
 255 F.3d 1073 (9th Cir. 2001) ......................................26

*Grand Canyon Tr. v. U.S. Bureau of Reclamation,*
 691 F.3d 1008 (9th Cir. 2012) ......................................13

*Lynch v. United States,*
 292 U.S. 571 (1934)..................................................25

*Meyers v. Birdsong,*
 ___ F.4th ___, No. 17-16907, slip op. (9th Cir. Oct. 11, 2023) ..................17, 21

- vi -

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Montana v. Wyoming*,
563 U.S. 368 (2011)..........................................................................23

*Morton v. Mancari*,
417 U.S. 535 (1974)..........................................................................17

*Nat. Res. Def. Council v. Houston*,
146 F.3d 1118 (9th Cir. 1998) ..................................................15, 27

*Nat. Res. Def. Council v. Jewell*,
749 F.3d 776 (9th Cir. 2014) ...........................................................27

*Nat. Res. Def. Council v. Kempthorne*,
627 F. Supp. 2d 1212 (June 3, 2009), *on reconsideration*, No. 1:05-
CV-1207 OWW SMS, 2009 WL 2424569 (E.D. Cal. Aug. 6, 2009)...............26

*Nat. Res. Def. Council v. Norton*,
236 F. Supp. 3d 1198 (E.D. Cal. 2017) ...........................................26

*National Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007)....................................................................passim

*Nebraska v. Wyoming*,
325 U.S. 589 (1945)..........................................................................25

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
606 F. Supp. 2d 1195 (E.D. Cal. 2008) ...........................................13

*Platte River Whooping Crane Critical Habitat Maintenance Tr. v. FERC*,
962 F.2d 27 (D.C. Cir. 1992)............................................................20

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976)...................................................................17, 21

*S. Delta Water Agency v. U.S., Dep't of Interior, Bureau of
Reclamation*,
767 F.2d 531 (9th Cir. 1985) ...........................................................19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sierra Club v. Babbitt,*
   65 F.3d 1502 (9th Cir. 1995) ............................................9, 20, 25, 26

*Smith v. Cent. Ariz. Water Conservation Dist.,*
   418 F.3d 1028 (9th Cir. 2005) ....................................................24, 25

*Stockton E. Water Dist. v. United States,*
   133 Fed. Cl. 204 (2017), *aff'd,* 745 F. App'x 377 (Fed. Cir. 2018)...................28

*United States v. Alpine Land & Reservoir Co.,*
   887 F.2d 207 (9th Cir. 1989) ...............................................................19

*United States v. Pioneer Irrigation Dist.,*
   144 Idaho 106, 157 P.3d 600 (2007) ..................................................18

*United States v. State of Cal., State Water Res. Control Bd.,*
   694 F.2d 1171 (9th Cir. 1982) .............................................................15

*United Water Conservation Dist. v. United States,*
   164 Fed. Cl. 79 (2023) .........................................................................28

*W. Va. v. Env't Prot. Agency,*
   597 U.S. ___, 142 S. Ct. 2587 (2022)...................................................9

**Statutes**

1905 Klamath Project Act, Pub. L. No. 58-66, ch. 567, 33 Stat. 714 .......................7

Central Valley Project Improvement Act ...................................................15

Colorado River Basin Project Act of 1968 ................................................13

Endangered Species Act, 16 U.S.C. §§ 1531–1544 ........................................passim

Endangered Species Act § 2(c)(2), 16 U.S.C. § 1531(c)(2) ....................................21

Endangered Species Act § 3(7), 16 U.S.C. § 1532(7) ..............................................8

Endangered Species Act § 7, 16 U.S.C. § 1536..............................................20, 25

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Endangered Species Act § 7(a)(2), 16 U.S.C. § 1536(a)(2) ............................passim

Pub. L. No. 97-304, 96 Stat. 1411 (codified at 16 U.S.C. § 1531(c)(2))................21

Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388..........................passim

Reclamation Act § 1 (codified at 43 U.S.C. § 391 ...................................17

Reclamation Act § 2 (codified at 43 U.S.C. § 411) ....................................6

Reclamation Act § 6, 32 Stat. 389 (codified at 43 U.S.C. §§ 491, 498)...........passim

Reclamation Act § 8, 32 Stat. 390 (codified at 43 U.S.C. §§ 372, 383)...........passim

Reclamation Act § 10, 32 Stat. 390 (codified at 43 U.S.C. § 373)..................passim

Reclamation Safety of Dams Act...............................................................15

**Constitutional Provisions**

U.S. Const., amend. V.........................................................................25, 28

**Other Authorities**

128 Cong. Rec. 13,071 (June 9, 1982)....................................................21

Congressional Research Service, *Bureau of Reclamation: History,
Authorities, and Issues for Congress* (Apr. 3, 2020), *available at*
https://crsreports.congress.gov/product/pdf/R/R46303 ..........................6, 27, 28

U.S. Bureau of Reclamation, "About Us – Mission,"
https://www.usbr.gov/main/about/mission.html (last visited
Oct. 13, 2023) ......................................................................................8

U.S. Bureau of Reclamation, Reclamation Manual, Policy PEC P05,
"Water-Related Contracts and Charges - General Principles and
Requirements," *available at*
https://www.usbr.gov/recman/pec/pec-p05.pdf................................................7, 8

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

U.S. Bureau of Reclamation, "Reclamation Project Histories,"
  https://www.usbr.gov/history/projhist.html (last visited Oct. 14, 2023)..............7

## I.    INTRODUCTION

Amici Curiae respectfully submit this brief in support of appellant Klamath Water Users Association ("KWUA"). Amici urge this Court to correct the district court's flawed analysis in order to restore predictability and certainty for water managers and water users who rely on federal water projects across the West.

In the case below, the district court ruled that a state agency order directing the U.S. Bureau of Reclamation (the "Bureau") to cease releasing water from Upper Klamath Lake in excess of the amounts needed to satisfy existing state water rights was preempted by the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544. *See* Order on Motions for Summary Judgment, Motions to Strike, and Motion to Stay ("Order"), Case No. 3:19-cv-04405-WHO, Dkt. 1102 at 1–2, 10, 28 (N.D. Cal. Feb. 6, 2023). The court reached that erroneous decision based on its incorrect predicate conclusion that Section 7(a)(2) of the ESA "applies" to *all* actions taken by the Bureau in operating the Klamath Project. Order at 27.

The district court's ruling is based on fundamental analytical errors, which threaten the reliability of Bureau water projects beyond the Klamath Basin. To conclude that Section 7(a)(2) of the ESA "applies," the court summarily disregarded both the Bureau's federal statutory mandate to comply with state water rights and state water law, and the Bureau's contractual obligations to honor water delivery contracts entered by the United States long before the passage of the ESA.

- 1 -

Order at 26–27. The district court erroneously concluded that the Bureau exercises "discretion" in *all* agency actions pursuant to the agency's organic statute, the Reclamation Act of 1902 ("Reclamation Act"), Pub. L. No. 57-161, 32 Stat. 388, because "Congress gave the Bureau a broad mandate in carrying out the Reclamation Act." Order at 27. Therefore, the district court concluded the Bureau may choose not to fulfill its statutory mandates and contractual obligations if it does so in the name of Section 7(a)(2) of the ESA. Order at 27. In so concluding, the district court ignored the analytical framework required by the U.S. Supreme Court in *National Ass'n of Home Builders v. Defenders of Wildlife* ("*Home Builders*"), 551 U.S. 644, 664 (2007), failed to seriously engage with the Bureau's federal statutory authorities, and failed to even attempt to harmonize perceived conflicts between Section 7(a)(2) of the ESA and the Bureau's other statutory mandates and contractual obligations, as *Home Builders* requires. Order at 25–27. As a result, the district court misinterpreted both the Reclamation Act and the ESA.

Had the district court correctly applied *Home Builders*, it would have concluded that Section 7(a)(2) of the ESA does not override the Bureau's other mandatory federal obligations. These include, at minimum, (1) complying with state water rights and state water law, as Section 8 of the Reclamation Act mandates, and (2) complying with nondiscretionary terms of existing federal contracts entered by the Bureau with water users.

Millions of people across the West rely on Bureau water storage and delivery projects. Many—if not most—of these water systems arguably have some relationship to species protected under the ESA. The district court's erroneous decision creates enormous uncertainty for Western water users in the form of ever-present and seemingly unrestrained agency "discretion." Amici urge this Court to correct the district court's flawed analysis.

## II.  INTERESTS OF AMICI CURIAE

Amici represent water suppliers who provide irrigation water in 17 Western states. Amici include state and national associations whose members rely on the consistent and predictable operation of federal water projects to supply water to human communities and to grow the nation's food.

Oregon Water Resources Congress ("OWRC") is an Oregon nonprofit corporation and trade association founded in 1912 to protect water rights and encourage water conservation and stewardship throughout Oregon. OWRC's members include irrigation districts and other entities directly involved in the collection, storage, transfer, delivery, and use of water for agriculture. Many of OWRC's members rely on Bureau projects for water supplies. OWRC's members serve nearly 575,000 irrigated acres, supporting Oregon's annual $5.32 billion agricultural industry.

National Water Resources Association ("NWRA") is a nonprofit, voluntary organization of state water associations, whose members include cities, towns, water conservation and conservancy districts, irrigation and reservoir companies, ditch companies, farmers, ranchers, and others with interests in water issues in the Western states. Many of these members rely on federal water projects for water supplies. NWRA has member associations in Arizona, California, Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oregon, Texas, Utah, and Washington.

Oregon Farm Bureau Federation ("OFBF") is a nonprofit grassroots organization representing the interests of Oregon's farming and ranching families and businesses. With nearly 6,500 member families professionally engaged in agriculture, OFBF is Oregon's largest general agriculture advocacy organization, representing all farm sizes, production methods, and commodities.

Family Farm Alliance ("Alliance") is a grassroots, nonprofit organization composed of family farmers, ranchers, irrigation districts, and allied industries in 16 Western states. Its mission is to ensure the availability of reliable and affordable irrigation water supplies to Western farmers and ranchers. The day-to-day management activities of many Alliance members are directly tied to storage water from Bureau projects. The Alliance has a long history of collaboration with constructive partners in all levels of government, with conservation and energy

organizations, and with Native American tribal interests who seek real solutions to water resources challenges in the West.

Agribusiness and Water Council of Arizona ("ABWC") is a nonprofit association founded in 1978, whose members are responsible for annually providing 2.5 million acre feet of water to 500,000 acres of Arizona farmland, supporting Arizona's annual $24 billion agricultural industry. Many of ABWC's members rely on federal water supplies to fulfill their responsibilities.

Idaho Water Users Association ("IWUA") is a nonprofit corporation representing approximately 300 canal companies, irrigation districts, ground water districts, municipal and public water suppliers, hydroelectric companies, aquaculture interests, agribusinesses, professional firms, and individuals throughout Idaho. Its purpose is to promote, aid, and assist in the development, control, conservation, preservation, and utilization of Idaho's water resources. Many of IWUA's members rely on federal water projects for water supplies.

Washington State Water Resources Association ("WSWRA") is an association of agricultural water providers delivering water to farms to enable billions of dollars of food production annually. WSWRA seeks to promote responsible stewardship of the water resources of the State of Washington for the benefit of all citizens; engage in educational and other activities that promote the efficient formation and operation of irrigation districts and irrigation companies;

and support the development, control, conservation, preservation, and utilization of water resources in a manner that will protect the environment, promote economic growth, and add stability to irrigated agriculture and related business. Many of WSWRA's members rely on federal water projects for water supplies.

### III.   ARGUMENT

**A.**     ***Home Builders* sets forth the legal framework to resolve apparent conflicts between Section 7(a)(2) of the ESA and the Bureau's federal statutory mandates and contractual obligations.**

Water scarcity is an ever-present challenge in the West, and the Bureau is routinely asked to make water management decisions based on "seemingly categorical—and, at first glance, irreconcilable—legislative commands." *See Home Builders*, 551 U.S. at 661.

In 1902, Congress enacted the Reclamation Act, setting forth the Bureau's central purpose to develop "irrigation works for the storage, diversion, and development of waters, including artesian wells" in the 17 Western states. Reclamation Act § 2 (now codified at 43 U.S.C. § 411). Congress has since authorized more than 180 individual reclamation projects through project-specific legislation. Congressional Research Service, *Bureau of Reclamation: History, Authorities, and Issues for Congress* at 1 (Apr. 3, 2020) ("CRS Report").[1] These project-specific authorization acts further define the purposes for which each water

---

[1] *Available at* https://crsreports.congress.gov/product/pdf/R/R46303.

project is authorized and, accordingly, refine the scope of the Bureau's authorities,

obligations, and discretion to manage individual projects. For example, as relevant

to this case, through the 1905 Klamath Project Act, Congress directed the

Secretary of Interior[2]

> in carrying out any irrigation project that may be
> undertaken by him under the terms and conditions of the
> national reclamation Act to raise or lower the level of
> [Lower or Little Klamath Lake] as may be necessary …
> under the terms and conditions of the national
> reclamation Act.

Pub. L. No. 58-66, ch. 567, 33 Stat. 714. Other project-specific authorizing acts

similarly direct the Bureau to take specific actions and operate individual projects

for specific purposes.[3]

To aid in the funding of these federal reclamation projects, Congress

directed the Bureau to enter into binding, long-term contracts with water users,

assuring the delivery of irrigation water from Bureau-constructed and -operated

systems. *See California v. United States*, 438 U.S. 645, 677 (1978) ("*California v.

U.S.*"). The terms of these contracts vary significantly, depending primarily on

what their underlying congressional authorizations require. *See generally* U.S.

---

[2] The Bureau is housed within the Department of Interior.

[3] For more information about individual reclamation projects and their
specific congressional authorizations, see U.S. Bureau of Reclamation,
"Reclamation Project Histories," https://www.usbr.gov/history/projhist.html (last
visited Oct. 14, 2023).

Bureau of Reclamation, Reclamation Manual, Policy PEC P05, "Water-Related Contracts and Charges – General Principles and Requirements" (identifying types of "repayment contracts," "water-related contracts," and "water service contracts" and stating that applicable "contracting authority must be consulted for associated requirements").[4] By the Bureau's own estimates, the Bureau now provides one out of five Western farmers with irrigation water for 10 million acres of farmland that produce 60 percent of the nation's vegetables and 25 percent of its fruits and nuts.[5]

In 1973, after most major reclamation projects had already been constructed, Congress enacted the ESA. There is no dispute that the Bureau is a "federal agency" subject to the ESA. *See* 16 U.S.C. § 1532(7) (defining "[f]ederal agency"). Like all federal agencies, the Bureau is generally subject to Section 7(a)(2) of the ESA, which requires that federal agencies "shall … insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species," except as otherwise authorized by the ESA. 16 U.S.C. § 1536(a)(2). When the Bureau decides to take an "action," this provision imposes both a substantive obligation on the Bureau— *i.e.*, a duty to ensure that the action in question will avoid jeopardy to ESA-

---

[4] *Available at* https://www.usbr.gov/recman/pec/pec-p05.pdf.
[5] U.S. Bureau of Reclamation, "About Us – Mission," https://www.usbr.gov/main/about/mission.html (last visited Oct. 13, 2023).

protected species, except as otherwise authorized by the ESA—and a procedural obligation—*i.e.*, a duty to consult with federal wildlife agencies before engaging in any discretionary action that may affect a protected species. *Sierra Club v. Babbitt*, 65 F.3d 1502, 1504–05 (9th Cir. 1995).

Throughout the West, conflicts between the Bureau's legal obligations to water users and to ESA-protected species routinely arise. On one hand, the Bureau must comply with its fundamental congressional directive to develop and manage water storage and delivery infrastructure. *See W. Va. v. Env't Prot. Agency*, 597 U.S. ___, ___, 142 S. Ct. 2587, 2609 (2022) ("Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." (internal quotation marks, brackets, and citation omitted)). On the other hand, the text of Section 7(a)(2) of the ESA is expansive and could theoretically apply to "almost anything that an agency might do." *Home Builders*, 551 U.S. at 664.

Applying a consistent and rigorous legal framework to resolve these conflicts is critical, because this tension is not unique to the Bureau's actions in the Klamath Basin. As reflected by the broad geographic interests represented by Amici, human communities across the West rely on the Bureau to honor the federal government's legal obligations to water users. The Bureau does not have unfettered "discretion" to avoid these obligations and, therefore, the district court's

perfunctory conclusion that the Bureau has a "broad mandate in carrying out the Reclamation Act" is both inadequate and deficient. Order at 27. Rather, a faithful application of *Home Builders* requires that decision makers tasked with resolving these conflicts thoroughly interpret the Bureau's specific statutory mandates and contractual obligations on a case-by-case basis. This Court should correct the district court's misapplication of *Home Builders* and reaffirm the legal framework that the Bureau and courts throughout the Ninth Circuit must apply.

**B.**   **The Bureau must comply with its statutory mandates and contractual commitments to water users, and Section 7(a)(2) of the ESA cannot be interpreted to override these other federal obligations.**

Under *Home Builders*, Section 7(a)(2) of the ESA "come[s] into play *only when an action results from the exercise of agency discretion*." 551 U.S. at 665 (emphasis added). To determine whether the Bureau's action "results from the exercise of agency discretion," a court (or the Bureau, in the first instance) must carefully examine the nature of the action in question and the source(s) of the Bureau's authority to take the action. *See id.* at 661–67.

As such, the *Home Builders* analysis must begin with the Bureau's authorities rather than the agency's own characterization of its action, because the goal is to "harmonize[]" competing federal mandates with Section 7(a)(2) of the ESA. *Id.* at 666 ("We must … read § 7(a)(2) of the ESA against the statutory backdrop of the many mandatory agency directives whose operation it would

implicitly abrogate or repeal if it were construed as broadly as the Ninth Circuit did below."). The Bureau (like all federal agencies) relies on many sources of federal authority and, therefore, must adhere to many federal mandates. The Bureau, like all other agencies of the federal government, must also adhere to contracts entered into with its citizens.

If any one of these authorities mandates that the Bureau take an action, that specific action is "nondiscretionary"—*i.e.*, the Bureau lacks authority *not* to take the action. The Bureau cannot dodge or otherwise avoid its federal mandates by characterizing the "agency action" in question broadly or observing that the agency generally enjoys "discretion" to carry out its policy goals and contractual obligations. *But see* Order at 27 (concluding that "Congress gave the Bureau a broad mandate in carrying out the Reclamation Act, meaning it has discretion in deciding how to do so. Under *Home Builders*, that discretion means that Section 7(a)(2) applies."); *id.* at n.8 ("Because I find that the Bureau has discretion under the Reclamation Act, I need not address the other potential sources of discretionary authority that the United States and plaintiffs assert."). Rather, if any source of federal law binds the Bureau to a specific nondiscretionary action, Section 7(a)(2) of the ESA cannot be interpreted to modify or further condition that obligation. *Home Builders*, 551 U.S. at 664.

**C.  The district court failed to seriously engage with the Bureau's statutory mandates and contractual obligations, based on a cursory conclusion that Congress generally granted the Bureau broad policy authority.**

The district court misapplied *Home Builders* by refusing to examine the Bureau's federal authorities in detail and, instead, focusing on two select provisions of the Reclamation Act. Order at 27. As the district court noted, Section 10 of the Reclamation Act includes an elastic clause, which authorizes the Secretary of Interior to "perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying out the provisions of this Act into full force and effect." *Id.* (citing 43 U.S.C. § 373). Section 6 of the Reclamation Act, also cited by the district court, addresses the Bureau's original source of authority to finance reclamation projects, by "us[ing] the reclamation fund" established by the Reclamation Act "for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this Act." *Id.* (citing 43 U.S.C. § 491). Based on these two provisions alone, the district court reached the sweeping holding that "Congress gave the Bureau a broad mandate in carrying out the Reclamation Act, meaning it has discretion in deciding how to do so." *Id.*

As the *Home Builders* court acknowledged, established principles of federal statutory construction require more. *See Home Builders*, 551 U.S. at 665–67 (examining the text, context, and overall statutory scheme of the competing

statutory provisions at issue). Had the district court fully engaged with applicable sources of Bureau authority, as requested by the water users in this case, the court would have had no choice but to conclude that not *every* action taken by the Bureau is "discretionary" and, therefore, subject to Section 7(a)(2) of the ESA. *See, e.g.*, *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1018–19 (9th Cir. 2012) (holding that Colorado River Basin Project Act of 1968 specified criteria under which the Bureau must adopt Annual Operating Plan for Glen Canyon Dam and, because Bureau did not have discretion to deviate from those criteria, Section 7(a)(2) of ESA did not apply to Annual Operating Plan); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1201 (E.D. Cal. 2008) ("Certain aspects of the management of the [Central Valley Project/State Water Project in California] are non-discretionary as that term is utilized in *Home Builders*.").

### D. Section 8 of the Reclamation Act mandates that the Bureau abide by and adhere to state water rights and comply with state water law.

Despite the district court's emphasis on the Reclamation Act's "broad policy mandate," the Reclamation Act itself mandates that the Bureau take certain, nondiscretionary actions. As the Supreme Court explained in *California v. U.S.*, Section 8 of the Reclamation Act *requires* the Bureau to comply with state law in the "control, appropriation, use, or distribution of water," 438 U.S. at 675 (citation

omitted), absent a specific congressional directive to the contrary, *id.* at 668–69 & n.21.

Section 8 of the Reclamation Act provides:

> [N]othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory *relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, __shall__ proceed in conformity with such laws*, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: *Provided*, That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right.

32 Stat. 390 (codified at 43 U.S.C. §§ 372, 383) (emphasis added). In *California v. U.S.*, the Supreme Court conducted an extensive review of the events leading to the passage of the Reclamation Act and the legislative history of the Act. The Court concluded that "[t]he legislative history of the Reclamation Act of 1902 makes it abundantly clear that Congress intended to defer to the substance, as well as the form, of state water law." 438 U.S. at 675. The statutory directive that the Bureau "*shall*" follow state water law imposes a mandatory, nondiscretionary obligation that Section 7(a)(2) of the ESA cannot implicitly abrogate. *Home Builders*, 551 U.S. at 669.

- 14 -

The *California v. U.S.* Court envisioned that only "specific," "clear," and "explicit" federal grants of authority to the Bureau could have the effect of overriding the Bureau's obligation to follow state water law under Section 8. *United States v. State of Cal., State Water Res. Control Bd.* ("*SWRCB*"), 694 F.2d 1171, 1175 n.10 (9th Cir. 1982). In particular, the Court stated that "legislation authorizing a specific [reclamation] project may by its terms signify congressional intent" that the Bureau does not need to comply with state water law. *California v. U.S.*, 438 U.S. at 668 n.21. The Ninth Circuit has further interpreted *California v. U.S.* as requiring "that the United States follow state water law absent a pre-empting federal statute" in carrying out its duties under the Reclamation Act. *SWRCB*, 694 F.2d at 1176; *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1132 (9th Cir. 1998).[6]

---

[6] The only time courts have found that a subsequent statute preempts the Bureau's obligation to adhere to state water law under Section 8 is when a project-specific congressional authorization contains specific requirements that are contrary to state law. *See, e.g.*, *Confederated Tribes & Bands of Yakama Nation v. McDonald*, No. CY-02-3079-AAM, 2003 WL 1955763, at *6 (E.D. Wash. Jan. 24, 2003) (holding that Reclamation Safety of Dams Act under which Bureau was proceeding to repair dam was clear congressional directive overriding state law); *see also Houston*, 146 F.3d at 1132 (remanding for determination whether California law conflicted with federal Central Valley Project Improvement Act). Yet, here, the district court failed to even attempt to evaluate the specific text of the Klamath Project's authorizing legislation.

The district court did not follow this required analytical framework and did not analyze whether any federal statute preempts the Bureau's obligations under Section 8 of the Reclamation Act. *See* Order at 25–27. In fact, the district court chose not to engage with the text, context, and legislative history of Section 8 at all. Instead, the district court selectively cited two other sections of the Reclamation Act (Section 6 and Section 10), interpreted those provisions in isolation, and summarily concluded that, "[t]aken together, these provisions show that Congress granted … the Bureau … a broad mandate that did not direct the Bureau to perform any specific nondiscretionary actions but instead is better characterized as directing [the Bureau] to achieve particular goals." Order at 27 (internal quotation marks omitted; brackets in original). This erroneous conclusion misinterprets the Bureau's respective authorities, obligations, and discretion under the Reclamation Act as a whole.

### 1.    Neither Section 6 nor Section 10 of the Reclamation Act functions to unravel the Bureau's congressional mandate to abide by and adhere to state water rights and follow state water law.

Interpreted correctly, neither Section 6 nor Section 10 offers a broad mandate for the Bureau to simply ignore and otherwise avoid its specific congressional mandate under Section 8. The district court erroneously concluded otherwise, because the district court did not read the Bureau's general policymaking authority granted by Sections 6 and 10 in the context of the Bureau's

- 16 -

specific congressional mandate under Section 8. *See Meyers v. Birdsong*, ___ F.4th ___, ___, No. 17-16907, slip op. at 7 (9th Cir. Oct. 11, 2023) (court must "read words in their context and with a view to their place in the overall statutory scheme" and may "not look at individual subsections in isolation" (internal quotation marks and citations omitted)); *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("[W]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."); *Home Builders*, 551 U.S. at 663 ("'[A] statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.'" (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976))).

Section 6 of the Reclamation Act specifically relates to the Bureau's use of the Reclamation Fund, established by Section 1 of the Reclamation Act, 43 U.S.C. § 391, to operate and maintain reclamation projects. Section 6 provides:

> That the Secretary of the Interior is hereby authorized and directed to use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this Act.

32 Stat. 389 (codified at 43 U.S.C. § 491). A fundamental purpose of the Reclamation Act was to use funds from the sale of public lands in Western states to build and operate reclamation projects in those states. *See California v. U.S.*, 438 U.S. at 664. It is unremarkable that Congress, in authorizing the construction of

large-scale reclamation projects, also authorized and directed the Bureau to oversee the continued operation and maintenance of these projects.

To the extent that Section 6 grants the Bureau some policy discretion to comply with that specific directive, it cannot be interpreted so broadly that it overrides the Bureau's *other* specific congressional directives. Section 6 does not absolve the Bureau from complying with state water law in carrying out the operation of the project works as Congress mandated under Section 8. *Id.* at 674– 75; *United States v. Pioneer Irrigation Dist.*, 144 Idaho 106, 110, 157 P.3d 600, 604 (2007) ("[Although] the United States retains control of the operation of the project and distribution of its benefits to ensure they are properly used[,] … the Act clearly provided that state water law would control in the appropriation and later distribution of the water." (internal quotation marks and citations omitted)).

For its part, Section 10 authorizes the Bureau to perform such acts and make such regulations as necessary to give effect to the overall purpose of the Reclamation Act. Section 10 provides:

> The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper *for the purpose of carrying [out] the provisions of this act into full force and effect*.

32 Stat. 390 (codified at 43 U.S.C. § 373) (emphasis added). By its plain text, Section 10 does not grant the Bureau unfettered policy discretion. Rather, Section

10 explicitly limits the agency's discretionary authority to acts and rulemaking "for the purpose of carrying the provisions of this act into full force and effect." *Id.* The "provisions" of the Reclamation Act necessarily include the Bureau's specific congressional mandate under Section 8. Indeed, the Ninth Circuit has previously interpreted the interplay between Section 8 and Section 10 of the Reclamation Act and held that, under Section 10, the Bureau is authorized to promulgate regulations provided that state law standards mandated by Section 8 are followed. *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989).

Neither Section 6 nor Section 10 offers an escape valve for the Bureau's statutory mandate under Section 8. The Bureau *must* adhere to state law in its "control, appropriation, use, or distribution of water." *California v. U.S.*, 438 U.S. at 675 (citation omitted); *S. Delta Water Agency v. U.S., Dep't of Interior, Bureau of Reclamation*, 767 F.2d 531, 537–38 (9th Cir. 1985) (holding that Bureau must comply with California law in operating Central Valley Project).

> **2. The ESA itself does not undermine the Bureau's congressional mandate to abide by and adhere to state water rights and follow state water law.**

The district court's decision effectively repeals Section 8's command that the Bureau "shall proceed in conformity" with state water law. 43 U.S.C. § 383. This outcome is contrary to the presumption against implied repeals of an agency's statutory mandates. *See Home Builders*, 551 U.S. at 662–63. It also misinterprets

Section 7(a)(2) of the ESA. The ESA simply does not contain a "specific congressional directive[] which [is] contrary to state law regulating distribution of water" sufficient to relieve the Bureau from its obligation to comply with state law under Section 8. *California v. U.S.*, 438 U.S. at 672 n.25.

First, the ESA does not independently authorize the Bureau to take actions necessary to comply with Section 7(a)(2), because the ESA "does not expand the powers conferred on an agency by its enabling act." *Sierra Club*, 65 F.3d at 1510 (quoting *Platte River Whooping Crane Critical Habitat Maintenance Tr. v. FERC*, 962 F.2d 27, 34 (D.C. Cir. 1992)); *Platte River Whooping Crane*, 962 F.2d at 34 (rejecting argument that Section 7 of the ESA obligates agencies to "do whatever it takes" to protect threatened and endangered species and "implicitly supersede[s]" limitations on an agency's authority under its authorizing statute (internal quotation marks omitted)). As further explained by the D.C. Circuit, "the ESA does not loosen [the] limitations [of a project's authorizing statute] or expand Reclamation's authority." *Defs. of Wildlife v. Norton*, 257 F. Supp. 2d 53, 68 (D.D.C. 2003).

Second, the ESA is a statute of general applicability, while the Reclamation Act, along with project-specific authorizing legislation, are specific grants of authority to the Bureau. Endorsing the district court's interpretation of the ESA in this case would result in a general statute, the ESA, controlling the much more

specific Reclamation Act and project-specific authorizing act, contrary to well-established principles of statutory interpretation. *See Home Builders*, 551 U.S. at 663 ("'[A] statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.'" (quoting *Radzanower*, 426 U.S. at 153)).

Third, Section 7(a)(2) of the ESA must be interpreted within its own statutory context, which includes an explicit statement of congressional deference to state water law. *Meyers*, ___ F.4th at ___, slip op. at 7 (court must "read words in their context and with a view to their place in the overall statutory scheme" and may "not look at individual subsections in isolation" (internal quotation marks and citations omitted)). When Congress amended the ESA in 1982, it "declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species." Pub. L. No. 97-304, 96 Stat. 1411 (codified at 16 U.S.C. § 1531(c)(2)). As explained by U.S. Senator Steven Symms of Idaho, this addition "recognizing the complex system of western water laws that govern the agricultural productivity and power-generating capacity of Western States … was vital to the bill's acceptability." 128 Cong. Rec. 13,071, 13,183 (June 9, 1982). Therefore, not only does the ESA not contain the necessary clear, specific, and explicit congressional directive necessary to preempt the Bureau's obligations

under Section 8 of the Reclamation Act, but it explicitly states that the ESA shall be implemented in concert with state water law.

In short, the district court's decision misinterprets both the Reclamation Act and the ESA. This Court must correct the district court's analysis to give effect to Congress's directives under both statutes.

### 3. Giving proper effect to the Bureau's mandate under Section 8 of the Reclamation Act protects the stability of Western water law.

The district court's dismissal of Section 8 of the Reclamation Act has potentially grave consequences across the West, as state water law and state water rights are the bedrock of all federal reclamation projects. *See California v. U.S.*, 438 U.S. at 653 ("The history of the relationship between the Federal Government and the States in the reclamation of the arid lands of the Western States is both long and involved, but through it runs the consistent thread of purposeful and continued deference to state water law by Congress."). Federal reclamation projects rely on a clear division of responsibility between state and federal actors. Individual states, which have primary jurisdiction and control over water resources within their borders, have the exclusive authority to grant and administer the state water rights necessary to use public water resources. *See Cal. Or. Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 164 n.2 (1935) (observing that Congress "has repeatedly recognized the supremacy of state law in respect of the acquisition of water for the reclamation of public lands of the United States"). The

Bureau oversees, manages, and otherwise supports the large-scale physical infrastructure necessary to deliver water to state water right holders across vast distances in the arid West. *See California v. U.S.*, 438 U.S. at 663–75 (summarizing the "congressionally mandated division between federal and state authority" over reclamation projects).

This framework is grounded in the need for certainty and predictability. *Cf. Arizona v. California*, 460 U.S. 605, 620 (1983) ("Certainty of rights is particularly important with respect to water rights in … an otherwise water-scarce part of the country."). Throughout the West, communities must balance competing demands for limited water. Cities, agriculture, industry, and fish and wildlife all rely on adequate water. Over more than a century, state water law has evolved to respond to these competing needs by developing predictable systems for the administration of state water rights according to time-honored principles of prior appropriation. *See generally Montana v. Wyoming*, 563 U.S. 368, 375–76 (2011) (providing overview of prior appropriation doctrine). Under prior appropriation, states issue water rights on a first-come, first-served basis, and states respond to water scarcity by enforcing water rights in order of their seniority. *See id.* The Bureau plays an essential role within this framework, by managing the physical access to water that states have allocated (or not allocated) to fulfill state water rights.

This system can be imperfect, as neither states nor federal agencies can create more water to meet every demand. Nonetheless, it ensures that both water managers and water users can make informed decisions, based on a predictable set of rules. This predictability is as essential to farmers, whose planting decisions rely on expectations about limited water being available to grow crops, as it is to cities, which must maintain sufficient drinking water for their citizens, as it is to state, federal, and tribal managers, who rely on "instream" water rights to ensure adequate stream flows for fish and wildlife.

The district court's decision upsets this settled framework by effectively reading Section 8 out of the Reclamation Act. Accordingly, the decision calls into question the respective responsibilities of states and the Bureau to manage Western water resources. And it creates uncertainty for water users who rely on water rights that the Bureau could decide to simply ignore in the name of agency "discretion." The district court's decision is not only legally flawed but, if allowed to stand, will destabilize the foundational legal principles upon which Western water policy relies.

**E.    The Bureau must also honor existing, binding contracts, upon which water managers and human communities across the West rely.**

The Bureau's contracts are another source of the Bureau's mandatory, federal obligations and, therefore, Section 7(a)(2) of the ESA cannot be interpreted to modify these contractual obligations. *Smith v. Cent. Ariz. Water Conservation*

- 24 -

*Dist.*, 418 F.3d 1028, 1034 (9th Cir. 2005) ("Contracts implementing federally-funded water reclamation projects are by nature necessarily federal[.]" (citing *Nebraska v. Wyoming*, 325 U.S. 589, 615 (1945)). It should be self-evident that the Bureau is bound by the terms of any contract that it has executed on behalf of the federal government. *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."). The private rights created by Bureau contracts are also property rights protected by the Fifth Amendment to the U.S. Constitution. *Id.* ("Valid contracts are property" and "[r]ights against the United States arising out of a contract with it are protected by the Fifth Amendment.").

For all these reasons, courts must carefully examine the specific terms of Bureau contracts, to identify which terms are mandatory and, therefore, cannot be modified by Section 7(a)(2) of the ESA. *Cf. Sierra Club*, 65 F.3d at 1510 (holding that federal agencies cannot breach their preexisting contractual obligations absent a specific congressional authorization, which Section 7 of the ESA does not provide).

The Ninth Circuit's case law is consistent with this framework. Under controlling Ninth Circuit precedent, where a federal agency has entered a contract, under which it lacks discretion to take action that would inure to the benefit of

protected species, the federal agency lacks discretion to later amend the terms of the contracts for the benefit of an ESA-protected species. *Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1082 (9th Cir. 2001). In other words, actions that the Bureau is contractually bound to perform are nondiscretionary actions, and Section 7(a)(2) of the ESA cannot be interpreted to amend or further condition these existing contractual mandates. *Sierra Club*, 65 F.3d at 1510; *see, e.g.*, *Nat. Res. Def. Council v. Norton*, 236 F. Supp. 3d 1198, 1213–14 (E.D. Cal. 2017) (accepting federal government's argument that the Bureau "does not retain the authority to alter" the terms of executed Sacramento River Settlement contracts under Section 7(a)(2) of the ESA); *Nat. Res. Def. Council v. Kempthorne*, 627 F. Supp. 2d 1212, 1215–16 (June 3, 2009) (holding that Bureau lacked discretion to reallocate water under terms of executed Sacramento River Settlement contracts to address the needs of listed species), *on reconsideration*, No. 1:05-CV-1207 OWW SMS, 2009 WL 2424569 (E.D. Cal. Aug. 6, 2009).

The district court in this case failed to even consider the multiple, perpetual contracts executed between the Bureau and Klamath Project water users, which identify mandatory commitments that the Bureau must fulfill. As explained at length in Klamath Water Users Association's Reply in Support of Cross-Motion for Summary Judgment on First Cause of Action of United States' Crossclaim and Klamath Water Users Association's First Counterclaim before the district court,

Case No. 3:19-cv-04405-WHO, ECF No. 1090, the terms of these contracts require the Bureau to deliver certain amounts of water from the Klamath Project to various water users. Nonetheless, by not even citing the relevant contracts, the district court implicitly concluded that these contracts were irrelevant, abruptly pointing instead to the Bureau's "broad mandate in carrying out the Reclamation Act." Order at 27.

The district court's refusal to consider the contracts in this case threatens the reliance interests of water users beyond the Klamath Basin. Human communities across the West rely on Bureau contracts to assure the reliable storage, conveyance, and delivery of water. *See generally* CRS Report; *see also* Klamath Water Users Association's Opening Brief, Dkt. 20, at 37–50 (summarizing terms of nearly 200 contracts executed with Klamath Project water users alone). Because the terms of these contracts vary, courts—including the Ninth Circuit—have historically engaged with the specific terms of individual contracts to identify and interpret any nondiscretionary contractual obligations held by the Bureau. *E.g.*, *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014); *Houston*, 146 F.3d at 1125–26. The district court here failed to do so, undermining this established legal framework and calling into question the reliability of all Bureau contracts that now or at some point in the future implicate ESA-protected species.

The district court's decision, if left uncorrected, could be used for the proposition that the Bureau does not have to honor (or even consider) the United States' existing contracts with water users if it does so under the guise of agency "discretion" under the Reclamation Act. This erroneous conclusion is problematic not only for water users who rely on the Bureau to deliver their water. It also forecasts trouble for the Bureau, which relies on water contracts for much of the agency's revenue. *See* CRS Report at 4. If the Bureau may now evade its contractual commitments in the name of the ESA, as the district court's decision suggests, the agency undoubtedly will be the target of future takings claims under the Fifth Amendment. *See, e.g.*, *City of Fresno v. United States*, 160 Fed. Cl. 215 (2022); *Stockton E. Water Dist. v. United States*, 133 Fed. Cl. 204, 206 (2017), *aff'd*, 745 F. App'x 377 (Fed. Cir. 2018); *Baley v. United States*, 134 Fed. Cl. 619 (2017), *aff'd*, 942 F.3d 1312 (Fed. Cir. 2019); *Clear Creek Cmty. Servs. Dist. v. United States*, 132 Fed. Cl. 223 (2017); *cf. United Water Conservation Dist. v. United States*, 164 Fed. Cl. 79, 82 (2023) ("The water rights at issue in this action are governed by the Fifth Amendment of the U.S. Constitution and the Endangered Species Act ('ESA'), 16 U.S.C. §§ 1531-44."). If the district court's decision is left to stand, further litigation is all but certain.

## IV.   CONCLUSION

Although neither courts nor federal agencies can create more water, they *can* ensure the predictable and equitable allocation of existing water resources by applying the law consistently. This includes rigorously interpreting the Bureau's federal statutory authorities to enforce the Bureau's congressional mandate to follow state water law, and interpreting the Bureau's contracts to hold the federal government to its contractual commitments. The district court sidestepped these necessary analyses, resulting in an opinion that vastly overstates the Bureau's discretion and authority. Amici urge this Court to correct the district court's flawed analysis and restore predictability and certainty for water resource managers and water users across the West.

DATED: October 23, 2023

Respectfully submitted,

STOEL RIVES LLP

By: *s/ David E. Filippi*
   DAVID E. FILIPPI
   MERISSA A. MOELLER
   david.filippi@stoel.com
   merissa.moeller@stoel.com
   760 SW Ninth Ave., Suite 3000
   Portland, OR 97205

   WADE C. FOSTER
   wade.foster@stoel.com
   101 S. Capitol Blvd., Suite 1900
   Boise, ID 83702

   *Attorneys for Oregon Water*
   *Resources Congress, National*
   *Water Resources Association, and*
   *Oregon Farm Bureau Federation*

 Additional amici and counsel are listed on the next page. Pursuant to Circuit Rule 25-5(e), all other parties on whose behalf this filing is submitted concur in the filing's content.

NORMAN M. SEMANKO
PARSONS BEHLE & LATIMER
nsemanko@parsonsbehle.com
800 W. Main St., Suite 1300
Boise, ID 83702

*Attorney for Family Farm Alliance*

WADE NOBLE
MEGHAN SCOTT
NOBLE LAW OFFICE
wade@noblelaw.com
1405 W. 16th St. A
Yuma, AZ 85364

*Attorneys for Agribusiness and
Water Council of Arizona*

PAUL L. ARRINGTON
pla@idahowaters.com
1010 W. Jefferson St.
Boise, ID 83702

*Attorney for Idaho Water Users
Association*

LAWRENCE E. MARTIN
HALVERSON NORTHWEST
LAW GROUP
lmartin@hnw.law
405 E. Lincoln Ave.
Yakima, WA 98901

*Attorney for Washington State
Water Resources Association*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2023, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Participants in this Case No. 23-15499 & 23-15521 who are registered CM/ECF users will be served by the CM/ECF system.

*s/ David E. Filippi*
DAVID E. FILIPPI

*Attorney for Amici Curiae Oregon Water Resources Congress, National Water Resources Association, and Oregon Farm Bureau Federation*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-15499 & 23-15521

I am the attorney or self-represented party.

**This brief contains 6,739 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ David E. Filippi*         **Date** October 23, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*