IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
CASE NO. 23-15499
(Consolidated with 23-15521)

YUROK TRIBE, et al.,
*Plaintiff - Appellees*,

vs.

KLAMATH WATER USERS ASSOCIATION,
*Defendant-counter-claimant-cross-claimant-Appellant*.

Appeal from the United States District Court
For the Northern District of California, San Francisco
No. 3:19-cv-04405-WHO

**BRIEF OF AMICI CURIAE KLAMATH, MODOC, AND
SISKIYOU COUNTIES IN SUPPORT OF APPELLANT
KLAMATH WATER USERS ASSOCIATION**

PAUL S. WEILAND, Bar No. 237058,
pweiland@nossaman.com
BRIAN FERRASCI-O'MALLEY, Bar No. 46721,
bferrasciomalley@nossaman.com
NOSSAMAN LLP
18101 VON KARMAN AVENUE, SUITE 1800
IRVINE, CA 92612
Telephone:  949.833.7800
Facsimile:   949.833.7878
*Amicus Curiae SISKIYOU COUNTY,
CALIFORNIA*

*(Counsel Listing Continued)*

MARGARET E. LONG, Bar No. 227176
Prentice | Long
2240 Court Street
Redding, CA 96001
Telephone: 530.691.0800
Facsimile: 530.691.0700
margaret@prenticelongpc.com
*Amicus Curiae MODOC COUNTY, CALIFORNIA*

MARCUS M. HENDERSON, Bar No. 023241
Klamath County Counsel's Office
305 Main Street
Klamath Falls, OR 97601
Telephone: 541.883.4267
Facsimile: 541.883.4270
mhenderson@klamathcounty.org
*Amicus Curiae KLAMATH COUNTY, OREGON*

62128718

## TABLE OF CONTENTS

**Page:**

INTEREST OF AMICI CURIAE ...................................................................1

FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(2) COMPLIANCE ......1

I.  INTRODUCTION ...............................................................................2

II. ARGUMENT ......................................................................................6

   A. Reclamation's Delivery of Irrigation Water is a Non-Discretionary
     Action.................................................................................................6

     1. Section 7(a)(2) of the Endangered Species Act only applies to
       discretionary agency actions. ....................................................6

     2. The Reclamation Act does not confer discretion on Reclamation
       necessary to trigger ESA section 7(a)(2)...................................8

     3. The Kuchel Act is intended to protect the interests of the Counties.......10

   B. Curtailing Irrigation Deliveries Has Huge Impacts on the Counties. ...........12

     1. The Counties rely on funding from the lease lands.................................13

     2. Reduced water deliveries also threaten infrastructure and human
       safety in the Counties by impacting the soil and water table..................18

     3. Impacts on the NWRs.............................................................................21

     4. Impacts on the Counties go beyond economics. ....................................24

III.  CONCLUSION .................................................................................25

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS .............................27

CERTIFICATE OF SERVICE ...........................................................................28

62128718

# TABLE OF AUTHORITIES

**Page(s):**

**Cases**

*Ardestani v. Immigration and Naturalization Service*,
  502 U.S. 129 (1991).........................................................................11

*California v. United States*,
  438 U.S. 645 (1978)............................................................................8

*City of Santa Maria v. San Luis Obispo Coastkeeper*,
  S. Ct. No. 22-969 (Aug. 2023)...........................................................9

*Environment Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022), *cert. denied sub nom. Am. Petroleum
  Inst. v. Env't Def. Ctr.*, 143 S. Ct. 2582 (2023) ...............................8

*Hibbs v. Winn*,
  542 U.S. 88 (2004).............................................................................9

*National Association of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007).................................................................6, 7, 10

*United States v. LaBonte*,
  520 U.S. 751 (1997).........................................................................11

**Statutes**

16 U.S.C.
  § 695l ...............................................................................................10
  § 695m .............................................................................................10
  § 695n...........................................................................................10, 11
  § 1531(c)(2) .....................................................................................13
  § 1536(a)(2) .........................................................................6, 7, 8, 25

Act of February 9, 1905, ch. 567, 33 Stat. 714.....................................9

Kuchel Act, Pub. L. No. 88-567, 78 Stat. 850 (September 2, 1964)
  (codified at 16 U.S.C. §§ 695k-695r) ........................................*passim*

Reclamation Act of 1902, Pub. L. No. 57-161 § 2, 32 Stat. 388
(June 17, 1902) (codified at 43 U.S.C. §§ 371-616yyyy) .........................*passim*

**Regulations**

50 C.F.R. § 402.03 ....................................................................................6

**Other Authorities**

Brief History of Leaselands, U.S. Bureau of Reclamation (2008), at 1,
*available at* https://www.usbr.gov/mp/kbao/programs/land-lease/1-
bidding-program/2008/brief-history.pdf................................................................3

Nichols, Mitchell, & Lindner, *Consequences of Long-Term
Unemployment,* July 2013, The Urban Institute, at 11-12..................................25

## INTEREST OF AMICI CURIAE[1]

The Amici Curiae are three economically disadvantaged rural counties – the Counties of Klamath, Modoc, and Siskiyou – situated on the California-Oregon border (collectively, the "Counties").  The Counties share an interest in the long-term availability of water for irrigation in their communities.  The Counties submit this brief under FRAP 29 to emphasize the significant impacts to local communities that the curtailment of water deliveries can have on the health, welfare, and safety of the citizens of the Counties, and to stress the significant and irreparable harm that the district court's decision below will have on those public interests if not remedied by this Court.

## FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(2) COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(2), all parties provided written consent to filing of this brief.

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person—other than the Amici Curiae—made a monetary contribution to the brief's preparation or submission.

62128718

## I.    INTRODUCTION

The Klamath Irrigation Project ("Project") is a series of dams, lakes, reservoirs, and canals[2] that provide irrigation to approximately 200,000 acres of agricultural land in the interior regions of northern California and southern Oregon. The Project traverses the Counties and serves irrigators across the Counties.  The Project has played, and continues to play, a vital role in the multi-generational farming and ranching legacies of the Counties and enables agricultural operators to produce valuable crops that are critical to the Counties' economies and that contribute to the nation's food security.  The United States, through the Bureau of Reclamation ("Reclamation"), owns and primarily operates the Project under significant physical, hydrologic, and biological constraints.

The history of the lease lands within the Klamath Complex begins over a century ago when, in 1905, the states of Oregon and California ceded to the United States the lands under the Lower Klamath and Tule lakes.  During the same year, the U.S. Secretary of the Interior directed the U.S. Reclamation Service ("USRS"), the predecessor to Reclamation, to reclaim the lands beneath both lakes for the primary purpose of homesteading.

---

[2] The Project comprises several dams, lakes, and reservoirs, including Clear Lake Dam and Reservoir, Tule Lake, and Lower Klamath Lake in California, and Gerber Dam and Reservoir, Upper Klamath Lake, and Link River Dam in Oregon.

62128718

Prior to the reclamation of Lower Klamath Lake, President Roosevelt created the Klamath Lake Reservation (now the Lower Klamath National Wildlife Refuge ("Lower Klamath NWR")) by Executive Order 924 in 1908. *See* 10-KWUA_ER-2476. The Lower Klamath NWR was the first refuge for waterfowl in the United States, and encompassed areas within the modern-day Counties. Over the next several years, as portions of the Lower Klamath Lake were reclaimed, the lands were leased by Reclamation for grazing use. In the 1930s, however, it was discovered that these lands would produce grains. Since that time, the lands have primarily been used to produce grains and small hay, with limited grazing.

The reclamation of historic Tule Lake occurred gradually over several years, from approximately 1910 to 1914. *See* Brief History of Leaselands, U.S. Bureau of Reclamation (2008), at 1, *available at* https://www.usbr.gov/mp/kbao/programs/land-lease/1-bidding-program/2008/brief-history.pdf ("Brief History"). Reclamation initiated the lease land program in 1914 by leasing 263 acres of lake bed along the north shore of Tule Lake. *Id.* Originally, all lands beneath Tule Lake were scheduled for reclamation. *Id.* However, since there was no natural outlet for Tule Lake, drainage water collected in the southwest corner of the lake bed, which created optimal habitat for waterfowl. *Id.* Due to the abundance of waterfowl within this wetland area, President Coolidge created Tule Lake Bird Refuge (now the Tule

Lake National Wildlife Refuge ("Tule Lake NWR")) by Executive Order 4975 in 1928. *See* 10-KWUA_ER-2476. In 1932, to protect developed homestead lands from flooding, areas within the refuge were designated as sumps and reserved for flood control and drainage. Brief History at 2. Areas outside the sump, but within the refuge boundary, were leased by Reclamation for agricultural use and additional flood control. *Id.*

Since the lands within the boundaries of both the Lower Klamath NWR and Tule Lake NWR were originally intended for reclamation, they were ultimately vulnerable to the homesteading process. In the 1950s, an intense debate developed between agricultural interests, conservationists seeking to protect waterfowl populations, and proponents of homesteading. After undertaking numerous studies and technical reviews, the U.S. Department of the Interior recommended that refuge lands not be homesteaded and that the lands be permanently maintained under a leasing system. It was recommended that the leasing system be permanently maintained through legislative action. It was further recommended that lease revenues be shared with the counties.

Ultimately, after more than a decade of debate, the Kuchel Act was enacted on September 2, 1964. Pub. L. No. 88-567, 78 Stat. 850 (codified at 16 U.S.C. §§ 695k-695r). The Kuchel Act was recognized as settling long-standing questions regarding the fate of the Lower Klamath NWR and Tule Lake NWR. It struck a

4

compromise between local interests that desired the lands to remain in agricultural use with conservation interests that wanted the refuge's waterfowl values to be preserved. Thus, the Kuchel Act was viewed as a win-win solution, with lands remaining under federal ownership for the major purpose of waterfowl management, but allowing agricultural use to continue.

When the Kuchel Act was passed in 1964, farming had occurred on the lease lands within the Lower Klamath NWR and Tule Lake NWR for nearly 50 years. Thus, the enactment of the Kuchel Act was both a victory and a source of relief for the Counties, as they would now derive revenue from the lease lands within the refuge in perpetuity. The Kuchel Act also solidified the role of agriculture within the Counties, which still exists today.

In February 2023, the U.S. District Court for the Northern District of California issued an order in a dispute between the Yurok Tribe and Reclamation, the practical effect of which could effectively shut down the Project, wiping the long history of agriculture in the Counties off the map. This would be an unprecedented disaster for the Counties and the farmers, ranchers, and families within the Counties' borders.

The Counties, though of limited means, are compelled to file this brief as amici curiae in light of the alarming potential for the district court's decision to significantly harm the Counties and their respective residents. The Counties urge

62128718

this Court to conduct the proper statutory analysis that the lower court neglected and to keep in mind the significant local interests that are implicated by these decisions.

## II.   ARGUMENT

### A.   Reclamation's Delivery of Irrigation Water is a Non-Discretionary Action.

#### 1.   Section 7(a)(2) of the Endangered Species Act only applies to discretionary agency actions.

Section 7(a)(2) of the Endangered Species Act ("ESA") requires federal agencies to ensure that "any action authorized, funded, or carried out by such agency…is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2).  U.S. Fish and Wildlife Service ("USFWS") and National Marine Fisheries Service regulations explain that the scope of this requirement under section 7 is limited to "actions in which there is *discretionary* Federal involvement or control."  50 C.F.R. § 402.03 (emphasis added).  In *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ("*Home Builders*"), the Supreme Court affirmed that section 7(a)(2) "covers only discretionary agency actions and does not attach to actions…that an agency is *required* by statute to undertake once certain specified triggering events have occurred."  *Home Builders*, 551 U.S. at 669.  The *Home*

62128718

*Builders* Court explained that agency discretion "presumes that an agency can exercise 'judgment' in connection with a particular action." *Id.* at 668.

Below, the district court – functionally disregarding the distinction between discretionary and non-discretionary actions establish by *Home Builders* – found that other Ninth Circuit precedent had established that Reclamation must comply with the ESA in operating the Klamath Project. Op. at 27. The district court held that this conclusion alone "answers the question" in this case. *Id.* But the district court also opined that, even if it were to consider the argument that section 7(a)(2) only applies to discretionary agency actions, the proponents below had failed to identify "a specific mandate from Congress, imposed on [Reclamation], that is inconsistent with its obligations under the ESA." *Id.* The district court stated instead that Congress had given Reclamation "a broad mandate in carrying out the Reclamation Act, meaning it has discretion in deciding how to do so." *Id.* This reasoning contorts the analysis called for in section 7(a)(2) and affirmed by the *Home Builders* Court.

As this Court has previously explained, determining whether an action qualifies as a sufficient "agency action" under the ESA involves a two-step test:

> First, relying on the text of the statute, which is always the appropriate starting place for analysis, we consider whether an agency "affirmatively authorized, funded, or carried out the underlying activity." If this standard is met, we next determine whether the action was discretionary, in this context meaning that the agency had

7

"some discretion to influence or change the activity for the benefit of a protected species."

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 884 (9th Cir.

2022), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, 143 S. Ct.

2582 (2023) (citations omitted).

Proper analysis is predicated on consideration of the text of the statute itself.

By forgoing its own textual analysis, the district court skipped arguably the most

important step and jumped to the erroneous conclusion that the proponent must

instead identify some specific mandate that is incongruent with the ESA. This

Court should rectify that mistake.

### 2. The Reclamation Act does not confer discretion on Reclamation necessary to trigger ESA section 7(a)(2).

In the district court proceedings below, the parties all agreed that the Project

is authorized by the Reclamation Act of 1902 and a subsequent 1905 Act of

Congress. *See* ECF 1072 at 3:3-4; ECF 1065 at 10:10-11. In the Reclamation Act

of 1902, Pub. L. No. 57-161, § 2, 32 Stat. 388 (June 17, 1902), codified at 43

U.S.C. §§ 371-616yyyy, Congress authorized Reclamation to construct and operate

"dams, reservoirs, and canals for the reclamation of the arid lands in 17 Western

States." *California v. United States*, 438 U.S. 645, 650 (1978). In November

1902, post-enactment of the Reclamation Act, representatives of the Klamath

Basin suggested that the U.S. Reclamation Service ("USRS"), the predecessor to

8

Reclamation, examine irrigation possibilities in the Klamath Basin. STIPDX-003742. Following multiple years of evaluation, USRS determined that the Klamath Project concept was feasible and filed notices of appropriation of water. STIPDX-003742-43. On February 9, 1905, Congress passed an act that provided:

> The Secretary of the Interior is hereby authorized in carrying out any irrigation project that may be undertaken by him under the terms and conditions of the national reclamation act and which may involve the changing of the levels of Lower or Little Klamath Lake, Tule or Rhett Lake, and Goose Lake, or any other body of water connected therewith, in the States of Oregon and California, to raise or lower the level of said lakes as may be necessary to dispose of any lands which may come into the possession of the United States as a result thereof by cession of any State or otherwise under the terms and conditions of the national reclamation act.

33 Stat. 714; STIPDX-000492. The singular focus of Congress in both the Reclamation Act of 1902 and the subsequent 1905 act was to create irrigation projects like the Klamath Project. Reading broad discretion into these targeted instructions from Congress, as the district court did, flies in the face of the canon of interpretation that statutory language must be read in context. *E.g.*, *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (noting the cardinal rule that statutory language must be read in context), quoted in U.S. Br. at 11, City of Santa Maria v. San Luis Obispo Coastkeeper, S. Ct. No. 22-969 (Aug. 2023) (attached as Exhibit A). The actions described in the two acts are ones that Reclamation was *required* by statute to undertake—they were not discretionary actions, where Reclamation could use its

9

judgment to decide whether to do or not do the actions. *See Home Builders*, 551 U.S. at 669.

### 3. The Kuchel Act is intended to protect the interests of the Counties.

Congress affirmed the nondiscretionary nature of its instructions regarding the Klamath Project when it passed the Kuchel Act. Yet again, Congress reinforced the singular focus of the Project on irrigation. In pertinent part, the Kuchel Act states:

> ***16 U.S.C. § 695l.*** …Such [lease] lands [within the Lower Klamath NWR and Tule Lake NWR] ***shall be administered*** by the Secretary of the Interior for the **major** purpose of waterfowl management, but with ***full consideration to optimum agricultural use*** that is consistent therewith. Such lands shall not be opened to homestead entry. The following public lands shall also be included within the boundaries of the area dedicated to wildlife conservation, shall be administered by the Secretary of the Interior for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith, and shall not be opened to homestead entry…[description of lands within Siskiyou, Modoc, and Klamath Counties].
> ***16 U.S.C. § 695m.*** …25 per centum of the net lease revenues collected during each fiscal year from [Federal Lease Lands within Lower Klamath and Tule Lake NWR's] ***shall be paid annually***…to the counties in which such refuges are located.
> ***16 U.S.C. § 695n.*** The Secretary ***shall***, consistent with proper waterfowl management, ***continue*** the present pattern of leasing the reserved lands … within the Executive order boundaries of the Lower Klamath and Tule Lake National Wildlife Refuges [as] shown in … the report entitled "Plan for Wildlife Use of Federal Lands in the Upper Klamath Basin, Oregon-California," dated April 1956. Leases for these lands shall be at a price or prices designed to obtain the maximum lease revenues.

10

(Emphases added). The plain language of the statute lays out Congress' directive clearly: The Secretary **shall … *continue the present pattern of leasing the reserved lands***. 16 U.S.C. § 695n (emphasis added); *Ardestani v. Immigration and Naturalization Service*, 502 U.S. 129, 130 (1991) (there is a "strong presumption that [a] statute's plain language expresses congressional intent."); *United States v. LaBonte*, 520 U.S. 751, 757 (1997) ("[Courts] do not start from the premise that [the statutory] language is imprecise. Instead, [courts] assume that in drafting legislation, Congress said what it meant.").

Furthermore, the legislative history of the Kuchel Act supports the interpretation that Congress mandated that agriculture continue on lease lands for generations to come, particularly because it would provide revenue to rural, resource-limited Counties dependent of such revenue. *[need citation]*. In particular, the testimony of Secretary of the Interior Stewart Udall reflected his conclusion that the Kuchel Act would maintain agricultural leasing consistent with the economic needs of local communities, including the Counties.[3]

---

[3] Udall, S. L. 1962. Testimony of the Secretary of the Interior Stewart L. Udall regarding bill S. 1988 in hearings before the Subcommittee on Irrigation and Reclamation of the Committee on Interior and Insular Affairs, U.S. Senate, February 23, 1962.

62128718

**B.** **Curtailing Irrigation Deliveries Has Huge Impacts on the Counties.**

Halting or substantially restricting the delivery of water to nearly 185,000 acres of highly productive, irrigable farmland in the Klamath Basin would cause devastation to the Counties and their citizens that cannot be overemphasized. In the early 20th century, the federal government actively solicited people to move to the Klamath Basin and take advantage of its favorable climate, fertile soils, and abundant water, and, in response, settlers from eastern states, Europe, and elsewhere took on the challenge. Declaration of Derrick DeGroot ("DeGroot Decl."), ¶ 3. For over a century, irrigated agriculture has been a pillar of the Counties' economies and has supported vibrant agricultural communities that are rich in tradition and proud of what they do. *Id.*

In recent years, federal administration of the ESA has resulted in depriving farms of water, which has caused severe damage to residents, the economy, and the environment of the Counties. *Id.*, ¶ 4. Individual farming operations, their employees, and the businesses that support and depend on irrigated agriculture have experienced negative impacts. *Id.* Jobs and businesses have been lost. *Id.* Property values have decreased, which, in turn, significantly affects local governments because of lost tax revenues. *Id.*

12

The Counties also have a critical interest in knowing that the federal courts are properly applying the ESA to the management of limited local water resources within the Counties. Congress acknowledged in the ESA the interest of state and local water agencies in matters involving listed species and water resources. *See* 16 U.S.C. § 1531(c)(2) ("Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species."). The Court should consider the public interests that are injured by the application of the ESA to the operation of the Project in the manner contemplated by the district court. More importantly, the Court's jurisprudence should reflect due consideration of the fact that the legislative and executive branches purposely crafted the consultation provisions of the ESA to apply to discretionary federal agency actions and not to non-discretionary actions.

### 1. The Counties rely on funding from the lease lands.

The inability of farmers to receive water to irrigate their crops will cause significant economic harm to the Counties. For generations, the Counties have relied, and continue to rely, on the lease lands as an important aspect of the regional economy. For example, both Siskiyou County and Modoc County receive payments from Reclamation for the leasing of Klamath Project reserved lands in the Tule Lake NWR as outlined in the Kuchel Act. Declaration of James Smith ("Smith Decl."), ¶ 3; Declaration of Geri Byrne ("Byrne Decl."), ¶ 4. These lease

13

lands contain rich organic and muck soils that are very productive and are ideal for growing crops like grain, alfalfa, potatoes, grass and grain hay, and onions. Smith Decl., ¶ 4. Reclamation administers a Lease Land Program under a Cooperative Agreement with the USFWS with the objective of providing a commercial farming program with benefits for wildlife. *Id.*

Siskiyou County receives payments in lieu of taxes for roughly 16,000 acres of lease lands within the Tule Lake NWR. *Id.*, ¶ 5. This land typically generates between $365,000 to $490,000 per year for Siskiyou County's general fund. *Id.*, ¶ 6. These funds are derived from farmers' lease payments. *Id.*, ¶ 5. The funds help Siskiyou County support a wide variety of services and programs for County residents, including law enforcement, fire protection, jail and juvenile operations, criminal prosecution, libraries, tax collection, building inspection, property assessment, agricultural regulation, the County's share of mandated health and social services, and other essential services. *Id.*, ¶ 6.

In fiscal year 2021, Siskiyou County received $446,000 from these lease lands. *Id.*, ¶ 7. If the Reclamation Act is interpreted contrary to its plain language and intent as giving discretion to Reclamation to curtail irrigation deliveries to benefit ESA-listed species, Siskiyou County could lose this revenue because farmers, having no crops, would not be able to make lease payments. *Id.* Siskiyou County also receives personal property taxes for wheel lines and sprinklers that it

14

would not receive if the Reclamation Act is interpreted to give Reclamation such discretion because farmers, having lost their crops, would not be able to make these property tax payments. *Id.*, ¶ 10. In addition, in the near term, property values will also decline significantly without water. *Id.*, ¶ 15. For areas like Siskiyou County, the long-term effects of the lack of water include devastation to many businesses located within the County, which will further reduce County revenue. *Id.*, ¶ 14.

The situation in Modoc County is similarly dire. Modoc County receives payments in lieu of taxes for roughly 1,500 acres of lease lands within the Tule Lake NWR. Byrne Decl., ¶ 4. In fiscal year 2021, Modoc County received $92,179 from these lease lands. *Id.*, ¶ 6. This land typically generates between $60,000 to $90,000 per year for Modoc County's general fund, which represents approximately 1.3% of the County's total general fund. *Id.*, ¶ 5.

Like Siskiyou County, Modoc County also receives significant tax revenue related to agriculture that would be disrupted by continued or further reductions in water deliveries. Agriculture is the major industry in Modoc County. *Id.*, ¶ 10. Land that is irrigated by the Project accounts for 17.3% of Modoc County's total land value and 27.5% of Modoc County's personal property value. *Id.*, ¶ 9. Property taxes generated from this land provide Modoc County with nearly half of its discretionary revenue. *Id.* In Modoc County, the price per acre of irrigable land

15

is approximately $5,000, whereas the price of non-irrigable land is approximately $2,500. *Id.* Thus, if the irrigable land within the County becomes non-irrigable due to halted water deliveries, the land will decrease in value by approximately 50%. *Id.* This is consistent with what happened to land values the last time water deliveries were stopped within the Klamath Basin. *Id.*

In addition to the payments in lieu of taxes for lease lands and property taxes, Modoc County collects revenue from unsecured taxes for materials and equipment purchased within the County, such as tractors, wheel lines, and sprinklers. *Id.* Modoc County also receives approximately $170,000 from gas tax revenues. *Id.* If Reclamation is allowed to curtail irrigation deliveries in order to benefit ESA-listed species, farmers will not be able to make these tax payments and the County will lose another major source of revenue. *Id.*

The impact of reduced water deliveries to the Klamath Project is already harming the Counties. In early 2022, Reclamation announced that those irrigators with lease land contracts would only be required to pay 15% of their lease land payments, due to the lack of water deliveries to sufficiently irrigate the lease lands. Smith Decl., ¶ 8. Subsequently, on August 23, 2022, Reclamation notified Siskiyou County staff to expect that the payment for in lieu taxes in FY 2022 would be zero since net lease revenues are expected to be less than expenses. *Id.*

16

Modoc County similarly did not receive any lease revenues for FY 2022/2023. Byrne Decl., ¶ 6.

The impact of the district court's decision on the Counties is concrete and harmful. If the Court upholds the district court's determination and reduced water deliveries to the Project continue, or if irrigators choose to no longer enter into lease agreements due to the uncertainty of water delivery, the Counties will incur direct impacts to their general funds and the services they provide. *See, e.g., id.*, ¶ 9. The Counties rely on the lease lands to provide agricultural opportunities to their farming communities. The Counties rely on the farming and agriculture industries because a large percentage of the Counties' residents rely upon them for income. The loss of agricultural jobs from continued or expanded curtailment of irrigation deliveries would cause an economic downturn, causing families that have lived in the Counties for generations to leave the region. *Id.*, ¶ 11. The Counties would experience a significant economic downtown, in an economic climate that is already dire.

For example, approximately $84 million of Siskiyou County's agricultural value is derived from crops irrigated by farmers located within the service area of the Tulelake Irrigation District ("TID"). *Id.*, ¶ 11. The TID irrigates approximately 64,000 acres, out of the approximate 200,000 acres irrigated by the Project. *Id*. The Siskiyou County Agricultural Commissioner estimates that a

17

significant number of jobs would be directly impacted by the non-irrigation of the TID as a result of curtailment of irrigation deliveries to benefit ESA-listed species. *Id.*, ¶ 13. Such a downturn in employment would cause, among other things, significant harm to the Counties' citizens, impacting the economic well-being of the entire region.

2. **Reduced water deliveries also threaten infrastructure and human safety in the Counties by impacting the soil and water table.**

The Counties also face grave consequences to infrastructure and human safety from the continued collapse of the local soil profile due to reduced water deliveries. Smith Decl., ¶ 16. For over 80 years, this area was farmed in a respectful manner that maintained the shallow water table and saw water not consumed by crops or evaporated be recollected by a network of drain ditches across the Klamath Project. *Id.*, ¶¶ 12, 16. These drains were pumped back to the supply system and became the source of water for the next irrigation parcel downstream, and eventually became the source for the Tule Lake NWR and the Lower Klamath NWR. *Id.*, ¶ 16. Irrigation practices were aligned with crop rotations that used low-cost flood techniques that kept the shallow aquifer filled, and sprinkler irrigation was adopted where row crops demanded a more controlled approach to water application. *Id.*, ¶ 12. As the crops moved around, so did the techniques, keeping the soil profile filled with water, maintaining the stability of

18

the Counties' high quality organic soils and keeping them from becoming desiccated.  *Id.*, ¶¶ 12, 17.

However, over the past 22 years, water allocations to farms have been diminished repeatedly, sometimes to a zero allocation, often to less than 50 percent of the water needed to irrigate crops, and always less than what is needed to maintain soil profiles.  *Id.*, ¶ 18.  The result of curtailments of surface water has been an exponential depletion of the shallow aquifer that the Counties rely on.  *Id.*  Prior to more recent allocations of surface water, the aquifer serving the Counties was approximately **24 inches** below the soil surface.  *Id.*, ¶17.  Currently, it is a struggle to find moisture within the top **10 feet** of the soil surface.  *Id.*

After 22 years of reduced water allocations, the soil structure is failing. Shallow settling (i.e., soil compaction) is occurring, and with it, damage to buildings, roads, and other infrastructure.  *Id.* ¶ 19.  The space between soil particles, which was once cushioned by water that provided structure to the profile, has now been replaced with air.  *Id.*  When a large enough section of that profile is filled with air, it collapses and settling occurs.  *Id.*  For example, in late February of 2023, it became clear that the Tulelake High School gymnasium is sinking and becoming unstable due to loss of the soil profile.  *Id.*  This soil compaction is a direct result of the impacts to the shallow aquifer, which will only be made worse by continued rationing of irrigation water by Reclamation.  Deep irrigation wells

19

are not the reason for this condition. *Id.*, ¶ 20. The deep irrigation wells located in the Tulelake Basin are often cased with solid pipe to bedrock, where water is extracted from a deep aquifer, as identified in the Groundwater Sustainability Plan that Siskiyou County, Modoc County, the City of Tulelake, and the TID are party to. *Id.*

Another public health and safety consequence of the ESA-driven water shortage is associated with domestic wells relied upon by residents of areas outside the incorporated cities and towns. DeGroot Decl., ¶ 8. Shallow domestic wells, often only 40 feet in depth (or shallower), are all dependent on the shallow aquifer that is replenished by the irrigation project. Smith Decl., ¶ 20. Without water in the adjacent canals and drains or flood irrigation to draw from, recharge does not occur for these wells. *Id.*; DeGroot Decl., ¶ 8. When irrigation water has been denied, wells have dried up, meaning that households have not had water for drinking, cooking, and sanitation. DeGroot Decl., ¶ 8. For example, in 2021 and 2022, over 500 wells in Klamath County went dry. *Id.* Klamath County, in partnership with the state of Oregon, went to extraordinary lengths to address this problem, at considerable expense. *Id.* Funding for water delivery to homes with dry wells and improvements/deepening of wells were provided at an expense to taxpayers of over $9,000,000. *Id.*

20

The ESA-driven water shortages have also led to infrastructure damage and risks to public safety. For example, in 2021, many canals in Klamath County saw zero water for the first time ever. DeGroot Decl., ¶ 7. This led to drying and cracking of the soils that make up the canal banks, as well as to rodent burrows and weed infestation, which, in turn, led to both increased maintenance costs in order to be able to use the infrastructure, as well as to leaks and risks to public safety. *Id.*

As another example, a lack of water delivery led to 12,000 acres of additional private farm ground being put to fallow last year in Siskiyou County, not counting the 16,000 acres of lease lands in the Tule Lake NWR. Smith Decl., ¶ 13. Fallowing private ground allows what water is available to be delivered to selected and greatly reduced acres to meet the crops needs. *Id.* The costs of this practice are severe when considering lost production and income and zero return on investments on land, all of which creates an additional factor in the struggle for survival for all farmers within the Klamath Project. *Id.* Fallowed ground is also a source of weeds, which build up a seed bank in the soil that will have an adverse impact on crop production for years to come, and habitat for insect and disease pests, especially grasshoppers. *Id.*

### 3. Impacts on the NWRs.

The lack of allocated irrigation water has also impacted Tule Lake NWR and Lower Klamath NWR (collectively, the "Refuges"). Smith Decl., ¶ 21. The

21

Klamath Project is known as the most efficient of all irrigation systems designed by Reclamation, utilizing or reclaiming 80% of the water delivered to the Project. *Id.* A big part of this efficiency is the capturing of tail water by the Refuges, where it used to support millions of waterfowl during migrations north and south, and many other species of insects, vertebrates, other bird species, and fish. *Id.* This efficiency will be lost and the Refuges drained by curtailment of irrigation deliveries to benefit ESA-listed species. *Id.*

Historically, irrigated farmland in the Counties and the associated water conveyance infrastructure have supported abundant wildlife including waterfowl, reptiles and amphibians, large mammals such as deer and antelope, and raptors including large populations of bald eagles. DeGroot Decl., ¶ 6. Irrigation water curtailments result in loss of habitat and food for these environmental assets. *Id.* The critical wetland habitat found in the Klamath Basin is extremely important to waterfowl populations, farmers, and the County. Declaration of Elizabeth Nielsen ("Nielsen Decl."), ¶ 3. In addition to the critical wetland habitat itself, the location of the Klamath Basin along the Pacific Flyway makes this area internationally significant. *Id.* These refuge systems are globally unique and nowhere else in the world operates like the Klamath does. *Id.*

In the not-too-distant past, and for many decades, these Refuges represented the gold standard by which to manage for special status species, big game and non-

22

game species, wetlands, waterfowl, raptors, and rare plants; and supported management objectives such as share-cropping agriculture, water management, groundwater recharge, and grazing. *Id.*, ¶ 6. Economically, the Refuges attracted bird watchers and hunters from all over the world, and water management capabilities to support local agriculture. *Id.*

Recently, after an extended drought period including extreme drought conditions the last three years, and curtailments of irrigation supply to the Klamath Project agricultural lands, which provide water to the refuges through tail water deliveries, the co-management objectives at the Refuges have come to a screeching halt. *Id.*, ¶ 7. Except for a small, but expensive, water lease in 2023, there is no water flowing into or being stored at the Refuges. In 2022, the entire hunt program was terminated at the Refuges. *Id.* The expectation is that there will not be any water allocated to the Refuges until December 2023. *Id.* As a result, there will likely not be a viable visitor or hunting program in 2023 and there is very little other wildlife for recreationists to observe. The refuges are currently at 1% of their normal habitat, and less than 1% of normal waterfowl migration has passed through the refuges over the past four years. *Id.* The picture painted by these events is a dire one. Siskiyou County staff, Elizabeth Nielsen, has recently driven through the Refuges only to see dusty dry and weedy fields, very little wildlife, and nearly zero water. *Id.*, ¶ 8.

The economic impact of the Refuges on the County cannot be overstated. Yearly visitors to the Refuges generally total at least 175,000. *Id.*, ¶ 9. In 2020, over 195,000 visitors passed through the Refuges, but the number dropped to 128,000 in 2021, with the drought certainly playing a role in that precipitous decline. *Id.* Best estimates indicate a loss of over 1,000 hunt days for local hunting guides, who, because of a lack of water and waterfowl, cannot guides clients on the Refuges. *Id.*, ¶ 11. At an average of $250 per day per hunter in guiding fees, the negative impact to local guides is enormous. *Id.* This loss in guiding income also correlates to a loss in revenue to other related County businesses, like hotels, gas stations, restaurants, sporting goods stores, and RV parks. *Id.*, ¶ 12. Without water at the Refuges, hunters do not visit the Refuges and local businesses are directly affected. *Id.* This, in turn, corresponds to a drop in sales tax revenue and transient occupancy tax revenue for the Counties. *See e.g., id.* The lack of water also directly impacted the revenue to the Refuges themselves: in 2021, the Refuges generated over $33,000 in fees from refuge passes, but they only generated $42 in 2023. *Id.*, ¶ 10.

### 4.  Impacts on the Counties go beyond economics.

The impacts to the Counties of lost irrigation water go well beyond the economic impacts. DeGroot Decl., ¶ 5. The stress in the community is palpable and there have been negative effects on mental health in the rural communities of

the Counties. *Id.* Klamath County has seen "dust bowl" conditions as dry, prime topsoil literally blows away, which also raises public health issues, especially among those with sensitive respiratory conditions. *Id.*

Furthermore, the social impacts of an economic downturn are also important to consider. It is well documented that economic hardship, including joblessness, results in the breakdown of traditional family arrangements, increases use of public assistance, and causes higher rates of crime and violence. *E.g.,* Nichols, Mitchell, & Lindner, *Consequences of Long-Term Unemployment,* July 2013, The Urban Institute, at 11-12. Economic hardship can also induce behavioral changes that have important spillover effects on the community as a whole, including reducing investments in housing and other capital improvements. *Id* at 12.

## III.  CONCLUSION

In sum, the Counties have a wide variety of significant interests in the continued operation of the Klamath Project. For the foregoing reasons, the Counties respectfully request that the Court reverse the district court opinion and find that Reclamation lacks the discretion under the Reclamation Act to curtail the storage, diversion, and use of water for irrigation at the Project and remand the matter to Reclamation to determine how to fulfill its obligations under section 7(a)(2) of the ESA in light of the Court of Appeals decision.

62128718

Dated:    October 23, 2023      PAUL S. WEILAND
BRIAN FERRASCI-O'MALLEY
NOSSAMAN LLP

By: *_/s/ Paul S. Weiland_*
           Paul S. Weiland
           *Amicus Curiae SISKIYOU COUNTY,*
           *CALIFORNIA*

Dated:    October 23, 2023      PRENTICE | LONG

By: *_/s/ Margaret E. Long (auth. 10/23/23)_*
           Margaret E. Long
           *Amicus Curiae MODOC COUNTY,*
           *CALIFORNIA*

Dated:    October 23, 2023      KLAMATH COUNTY COUNSEL'S
OFFICE

By: *_/s/ Marcus M. Henderson (auth._*
*_10/23/23)_*
           Marcus M. Henderson
           *Amicus Curiae KLAMATH COUNTY,*
           *OREGON*

26

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s)** 23-15499, 23-15521

I am the attorney or self-represented party.

**This brief contains 5,892 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


Date: October 23, 2023        */s/ Paul S. Weiland* _____
                            Paul S. Weiland

27

62128718

**CERTIFICATE OF SERVICE**

In accordance with F.R.A.P. 25(d), I hereby certify that on October 23,

2023, I electronically filed the foregoing by using the Court's CM/ECF system and

that service will be accomplished by the appellate CM/ECF system on all

participants registered in this case as CM/ECF users.

*/s/ Paul S. Weiland*
Paul S. Weiland